**Paul L. GASPERI, t/d/b/a Parkway Theatre, et al., Plaintiffs,**

**v.**

**CINEMETTE CORPORATION OF AMERICA, a corporation, et al., Defendants.**

**Civ. A. No. 74–371.**

United States District Court,
W. D. Pennsylvania.

March 20, 1975.

John M. Feeney, Pittsburgh, Pa., for plaintiffs.

W. Gregg Kerr, Jr., Pittsburgh, Pa., for defendant Cinemette.

Charles W. Kenrick, Pittsburgh, Pa., for defendant Crown.

## OPINION AND ORDER

SNYDER, District Judge.

Defendants Cinemette Corporation of America and Cinemette-Associated Theatres, Inc. (Cinemette) filed a Motion to Dismiss Count III of the Amended Complaint "for lack of jurisdiction over the subject matter of Count III", which this Court treats as a Motion to Dismiss under Rule 12(b)(1) and Rule 12(h)(3) of the Federal Rules of Civil Procedure.[1] For the reasons which follow, this Motion will be denied.

Defendant Crown International Pictures, Inc. (Crown) has moved the Court for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Motion was argued in conjunction with Cinemette's Motion, and this Motion will be granted.

## THE COMPLAINT

Plaintiffs Paul L. Gaspari, owner of the Parkway Theatre, and Edmund and Erma Abel, owners of the New Crafton Theatre, brought an Anti-trust action against two categories of Defendants: One group is composed of Cinemette Corporation of America and its subsidiary, Cinemette-Associated Theatres, Inc., both of which, like the Plaintiffs, are motion picture exhibitors and owners of theatres in the Greater Pittsburgh area, as well as in other geographic areas. The other Defendants comprise a group of motion picture distributors to which Crown International Pictures allegedly belonged.

In Count One, the Plaintiffs set forth a charge that the Defendants have engaged in a conspiracy in restraint of trade in violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, by way of collectively refusing to make available to Plaintiffs picture films of equal quality and at reasonable exhibition dates with the Plaintiffs' competitors, including Cinemette. It was alleged that Defendants imposed unreasonable bidding requirements, unreasonable priority and clearance times, manipulated the length of runs and the commencement of sub-runs,[2] participated in controlling the number of prints which will be made available at any given time, so that exclusive or near exclusive rights were first given to Cinemette Theatres. Discrimination is also alleged with respect to special attraction films, such as those for children and Wild Life films, and in tie-in arrangements which resulted in Cinemette obtaining priority on top quality films, agreements as to the method of payment by Cinemette to the

---

1. Rule 12(b)(1) provides:
   "(b) . . . Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, . . . "

Rule 12(h)(3) provides:
   "(3) Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

2. A first sub-run is the exhibition of a motion picture film immediately after it ceases to be shown in "first run" theatres, normally those theatres in Downtown Pittsburgh.

Defendant Distributors, including the amount of said payments in order to make it look as if Plaintiffs were not competitive with Cinemette Theatres, as well as advertising and other financial tie-ins with Cinemette Theatres, all of which, it is contended, lessened and/or eliminated competition in the exhibition of motion picture films and resulted in the creation of a monopoly by Cinemette in the business of the exhibition of quality motion picture films.

Count Two of the Complaint charged that in January of 1974, Cinemette Corporation purchased the entire ninety individually owned theatres which operated under the name of "Associated Theatres". At the time of said acquisition Cinemette Corporation owned one hundred and six theatres, and as a result of this acquisition, Cinemette-Associated "owns 85% of all theatres that obtain first run films in the Greater Pittsburgh area and owns approximately 70% of all theatres in the Greater Pittsburgh area", resulting in a monopoly on exhibition of films in the Greater Pittsburgh area in violation of Section 2 of the Sherman Anti-Trust Act. Plaintiffs charge that Cinemette and Cinemette-Associated have attempted to monopolize the exhibition of quality motion pictures in other geographical areas [they own theatres in other parts of Western Pennsylvania, Ohio, West Virginia, Tennessee, New York and New England], in violation of Section 2 of the Sherman Anti-Trust Act. Plaintiffs contend that this monopolization, or conspiracy to monopolize, will lessen or eliminate competition in this area, and has caused the Plaintiffs to cease doing business because of their inability to obtain quality motion picture films.

Count Three then charges that the 1974 acquisition of the Associated Theatres by Cinemette Corporation will have the effect of substantially lessening competition in the business of exhibiting motion picture films and will tend to create a monopoly in violation of Section 7 of the Clayton Anti-Trust Act, 15 U.S.C. § 18. Further, that the acquisition had the effect of giving Cinemette a monopoly in the other geographical areas where it owns theatres outside of the Greater Pittsburgh area, also in violation of Section 7 of the Clayton Act.

## CINEMETTE'S MOTION TO DISMISS COUNT III OF THE AMENDED COMPLAINT

Cinemette's Motion to Dismiss Count III of the Amended Complaint for lack of jurisdiction over the subject matter is based upon the most recent interpretation by United States Supreme Court that actions under Section 7 of the Clayton Act must allege the acquisition was "in commerce", and that the proper interpretation includes only persons or activities within the flow of interstate commerce—"the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer". Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed. 2d 378 (1975).

We find the *Gulf* case to be inapposite. In that case, Copp Paving, a producer of asphaltic concrete, brought suit in the District Court in California, alleging *inter alia* that Gulf Oil had violated Section 7 of the Clayton Act. Copp asserted that Gulf Oil's acquisition of Industrial Asphalt, Inc. and Union Oil's acquisition of Sully-Miller Contracting Company resulted in a lessening of competition in the Los Angeles asphaltic concrete market, to the damage and injury of the Plaintiff. The District Court ordered full Discovery as to jurisdiction over Copp's asphaltic concrete claims. At the conclusion of Discovery, the Court dismissed the claims against Sully-Miller and the claims against the other defendants involving the marketing of asphaltic concrete finding that asphaltic concrete was made wholly from components produced and purchased intrastate and that the product market was exclusively and necessarily local. From these factors, the Court concluded that the alleged restraints of trade in asphaltic concrete

could not be deemed within the flow of interstate commerce even though the products were being used on the streets and roads in the Los Angeles area that were segments of the Federal Interstate Highway System. The Court further found that Copp had failed to show that the alleged restraints as to asphaltic concrete would affect any interstate market or would have a necessary or probable adverse consequence as to the construction of interstate highways, and hence to the flow of commerce. The Court then held that it lacked jurisdiction under either the Sherman Act or the Robinson-Patman and Clayton Acts. The Ninth Circuit reversed, holding that the production of asphalt "for use in interstate highways rendered the producers 'instrumentalities' of interstate commerce and placed them 'in' that commerce as a matter of law." Copp Paving Corp. v. Gulf Oil Co., 487 F.2d 202 at 204. It then concluded that jurisdiction properly attached to Copp's Clayton and Robinson-Patman claims as well, since these Acts were intended to supplement the purposes and effect of the Sherman Act.

The Supreme Court granted certiorari limited to the questions arising under the Clayton and Robinson-Patman Acts and concluded that although sales of asphaltic concrete were made for use in construction of interstate highways, such sales, by a firm engaged *entirely* in intrastate sales of asphaltic concrete which could be marketed only locally, were not "in commerce" within the jurisdictional ambit of either the Robinson-Patman or Clayton Acts. Mr. Justice Powell in delivering the Opinion for the majority stated, as here particularly applicable, the following (at p. 401 of 95 S.Ct. at pp. 390–391 of 42 L.Ed.2d):

"With respect to §§ 3 and 7 of the Clayton Act, the situation is not so clear. Both provisions were intended to complement the Sherman Act and to facilitate achievement of its purposes by reaching, in their incipiency, acts and practices that promise, in their full growth, to impair competition in interstate commerce. E. g., United States v. E. I. du Pont de Nemours & Co. 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); Standard Fashion Co. v. Magrane-Houston Co. 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922). The United States argues in its amicus brief that given this purpose, the 'in commerce' language of §§ 3 and 7 should be seen as no more than an historical anomaly. When these sections were originally enacted, it was thought that Congress' Commerce Clause power reached only those subjects within the flow of commerce, then defined rather narrowly by the Court. Thus, it is argued, the 'in commerce' language was thought to be coextensive with the reach of the Commerce Clause and to bring within the ambit of the Act all activities over which Congress could exercise its constitutional authority. Since passage of the Act, this Court's decisions have read Congress' power under the Commerce Clause more expansively, extending it beyond the flow of commerce to all activities having a substantial effect on interstate commerce. See Mandeville Island Farms, Inc., supra, 334 U.S. 219, at 229–233, 68 S.Ct. [996] at 1002–1005, 92 L.Ed. 1238. The United States concludes that the scope of the Clayton Act, like that of the Sherman Act, should be held to have expanded correspondingly, both because of Congress' clear intention to reach as far as it could and because Congress' purpose to foster competition in interstate commerce could not otherwise wholly be achieved.

This argument from the history and practical purposes of the Clayton Act is neither without force nor at least a measure of support. But whether it would justify radical expansion of the Clayton Act's scope beyond that which the statutory language defines—expansion, moreover, by judicial decision rather than amendatory legislation—is doubtful. In any event, this case does not present an occasion to decide the

question. Even if the Clayton Act were held to extend to acquisitions and sales having substantial effects on commerce, a court cannot presume that such effects exist. The plaintiff must allege and prove that apparently local acts in fact have adverse consequences on interstate markets and the interstate flow of goods in order to invoke federal antitrust prohibitions. *See* United States v. Yellow Cab Co., 332 U.S. 218, 230–234, 67 S.Ct. 1560, 1566–1568, 91 L.Ed. 2010 (1947).

Copp was allowed full discovery as to all interstate commerce issues. It relied primarily on the nexus theory rejected above, and presented no evidence of effect on interstate commerce. Instead it argued merely that such effects could be presumed from the use of asphaltic concrete in interstate highways. The District Court concluded, on the basis of the record before it, that petitioners' alleged antitrust violations had no 'substantial impact on interstate commerce.' There may be circumstances in which activities, like those of Scully-Miller and Industrial, would have such effects on commerce. On the record in this case, however, the conclusion of the District Court that no such circumstances existed here cannot be considered erroneous. This being so, the 'effects on commerce' theory, even if legally correct, must fail for want of proof."

The Supreme Court has thus declared as possibly coming within the protection of the Clayton Act not only activities "in commerce" but also activities having a substantial effect on commerce. Specifically, as noted by Mr. Justice Marshall in his concurring Opinion, "we ought not to characterize the construction offered by the United States [of the applicability of the Clayton Act to activities having a substantial effect on commerce although not 'in commerce'] as a 'radical expansion of the Clayton Act's scope.'" 95 S.Ct. at 403, 42 L.Ed. 2d at 392.

In *Gulf*, it is noted that the finding of the Court of the "exclusively and necessarily" local market for asphaltic product caused the Court to reject Copp's contention that its competitor's activities fell within the scope of the "in commerce" language of the Clayton Act. In the instant case, the subject matter, product or service, is the exhibition of feature motion pictures to the public. In Paragraph 23 of the Complaint, the Plaintiffs set forth that there is "interstate distribution of motion picture films" and, thus, they allege and must prove that the activities are "in commerce", or will have an adverse consequence on interstate markets and the interstate flow of goods. *Gulf, supra,* citing United States v. Yellow Cab Co., 332 U.S. 218, 230–234, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

The Plaintiffs here properly, we believe, argue that far from being "exclusively or necessarily local", the exhibition of feature motion picture films may be one of a sequence of events which occur in the natural flow of interstate commercial activities, and as such, falls within the scope of the "in commerce" language of Section 7 of the Clayton Act as interpreted by the Supreme Court in *Gulf*. At the least, the Plaintiffs have alleged this and must be given the opportunity to prove the same. *See* Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L. Ed.2d 148 (1969) (affirming a District Court's finding of Clayton Act violations through agreements which ended competition between the two daily newspapers of general circulation in Tucson, Arizona, and which had the effect of substantially lessening competition in Pima County, the appropriate geographic market). *Cf.,* Schenck Transp., Inc. v. Inter-County Motor Coach, Inc., 350 F. Supp. 306 (E.D.N.Y.1972) (holding that where the defendant carrier's charters, though they would have violated federal law had they occurred in interstate commerce [because they were not authorized by the carrier's Interstate Commerce Commission Certificate], were found to

have been conducted wholly within a state, the District Court had no jurisdiction over the competing carrier's action seeking injunctive relief under the Interstate Commerce Act). We, of course, express no opinion whatsoever on the Plaintiff's proofs in the instant case, but only that they should be given the opportunity to prove the allegations of the Clayton Act violations.

The Defendants also cite in support of their Motion, United States v. American Building Maintenance Industries, CCH Trade Reg.Rep. ¶ 74,876 (C.D.Cal.1973), and allege that motion picture film exhibition is an "intensively local activity", just as the janitorial services which were under scrutiny by the Court in that case. We believe that a great deal of difference exists between the performance of janitorial services in a theatre and the exhibition of films allegedly just received from an interstate carrier.

The Plaintiffs allege the film is "in commerce" or that it has a substantial effect on commerce, and, as previously stated, we believe they must be given the opportunity to prove their allegation.

An appropriate Order denying the Motion to Dismiss Count III of the Amended Complaint will be entered.

## CROWN'S MOTION FOR SUMMARY JUDGMENT

Defendant Crown International Pictures, Inc. has moved the Court for summary judgment in accordance with the provisions of Rule 56 (b) and (c) of the Federal Rules of Civil Procedure,[3] and has filed in support thereof the Affidavits of Mark Tenser, President of

Crown, Max Shabason, President of S. Perilman Films, Inc., and Eve Elman, Secretary-Treasurer of S. Perilman.

S. Perilman Films, Inc. has been the exclusive distributor of motion pictures for Crown in the Greater Pittsburgh area since 1966, but Perilman also distributes for smaller motion picture companies which do not maintain separate offices for the licensing of motion pictures to theatres in various parts of the United States.

In his Affidavit, Max Shabason, Perilman's President, states that all of the exhibitors in the Greater Pittsburgh area are contacted for an expression of interest whenever a particular picture becomes available for showing in this area. A "Playdate To Billing Worksheet" is submitted to Crown at the conclusion of negotiations with an exhibitor for the licensing of a Crown picture for exhibition. Shabason denies that bidding was ever requested of Paul Gaspari. He says that Perilman was not equipped to handle such a clerical procedure, and, in fact, did not have the types of motion pictures which were generally the subject of bidding, i. e., the more popular films such as "Godfather" and "Poseidon Adventure", etc.

Eve Elman, Secretary-Treasurer of Perilman Films, states in her Affidavit that the company records reflect no complaints regarding Perilman's distribution practices nor any requests that bidding for motion pictures be conducted. She handled the negotiations for films between October, 1972 and November, 1973, when Mr. Shabason joined the company. She certified that Crown's pictures were made available to all in-

---

3. Rule 56(b) and (c) provide:
  "(b) *For Defending Party.* A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.
  (c) *Motion and Proceedings Thereon.* The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing

may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

terested exhibitors, as was Mr. Perilman's practice, and specifically denies the practices as charged in the Complaint.

Mark Tenser, President of Crown, certified in his Affidavit that Crown does not deal directly with motion picture exhibitors, but operates through independent local distributors to whom it grants exclusive franchises which are awarded on a geographical area basis. He describes their distribution system as existing under the franchise agreements as follows: (a) Crown notifies the franchisee of the availability of each Crown picture; (b) Crown may advise the franchisee orally of the minimum rental terms, if any, such franchisee should attempt to secure from the exhibitors but does not set forth the same as an absolute requirement; (c) The franchisee handles all sales (including terms) and booking arrangements with local exhibitors in his geographic area and then submits these to Crown for approval; (d) Crown then provides the appropriate prints of the picture; (e) The franchisee collects the rental fee from the exhibitor as per the rental agreement, deducts its fee (generally a percentage of gross receipts) therefrom, and remits the balance to Crown.

Tenser states that Crown's exclusive franchisee in the Greater Pittsburgh area since November of 1966 has been S. Perilman Films, Inc., and submits copies of the 1966 Crown-Perilman Agreement and a specific agreement on two Crown motion pictures, "Road to Nashville" and "Toyko Olympiad". On behalf of Crown, he denies any policy which would make its motion pictures unavailable to particular exhibitors and sets forth that it has always been Crown's policy to encourage franchisees to put the motion pictures into as many theatres as possible in order to increase Crown's revenues which are based on a percentage of box office receipts. He specifically denies involvement in any activity designed to give preferential treatment to any exhibitor, and claims that Crown was not aware of any such activities on Perilman's part. He further states that Crown did not receive any complaints whatsoever from any exhibitor regarding the availability of Crown pictures.

Argument on the Motion for Summary Judgment was held on February 4, 1975, and at that time Counsel for the Plaintiffs was given 10 days within which to reply to Crown's Motion or to notify the Court that he did not intend to respond. Counsel has filed no response.

Under the mandate of Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is to be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Under subparagraph (e) of that Rule, when a motion for summary judgment is made and supported as provided in the Rules, the adverse party may not rest on mere allegations stated in his pleadings, but the response by affidavit or otherwise must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. Hubicki v. ACF Industries, Incorporated, 484 F.2d 519 (3d Cir. 1973); Swettlen v. Wagoner Gas and Oil, Inc., 369 F.Supp. 893 (W.D.Pa. 1974).

This Court finds that under the Affidavits filed in support of its Motion, Crown does not distribute motion pictures to exhibitors, but enters into agreements with independent distributors located in various geographical areas of the country under which they are given the exclusive right to distribute Crown's pictures to motion picture exhibitors within their particular areas. Although various agreements, as set forth in the Affidavits, did give Crown the right to set national or territorial sales policy with respect to the distribu-

tion of any and all of its motion pictures, Crown has not, in fact, done so and has not dictated to Perilman the manner or method of distribution. Crown has not placed any limitations on who can exhibit its pictures or to whom Perilman shall make them available. Furthermore, there is nothing to indicate that in Perilman's distribution practices there was any joinder of action with Crown which would constitute a basis for inference that Crown was engaged in any discriminatory practices.

Under our findings then, while we agree that summary proceedings must be used sparingly in complex anti-trust litigation,[4] we are convinced that the record here is wholly lacking in any evidence of conspiracy to restrain or monopolize commerce, and in any facts from which an inference of conspiracy can rationally be drawn, and that summary judgment should be granted. Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17 (9th Cir. 1971); Hamilton Street Corp. v. Columbia Pictures Corp., 244 F.Supp. 193 (E.D.Pa.1965); Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627 (E.D.N.C.1966), aff'd 388 F.2d 987, cert. denied 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153. We believe this ruling to be entirely consistent with Third Circuit Opinions relating to the standards of propriety for finding for the defendants as a matter of law. Viking Theatre Corp. v. Paramount Film Distributing Corp., 320 F.2d 285 (3d Cir. 1963), aff'd 378 U.S. 123, 84 S.Ct. 1657, 12 L. Ed.2d 743; Tripoli Company v. Wella Corporation, 425 F.2d 932 (3d Cir. 1970).

An appropriate Order granting Crown's Motion for Summary Judgment will be entered.

---

4. *Compare* First Nat. Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (where plaintiff claimed treble damages of $109,000,000 for conspiracy to boycott plaintiff's sale of oil and in which summary judgment was entered by the District Court, which was affirmed by the Court of Appeals and the United States Supreme Court) with Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (an anti-trust claim of conspiracy to eliminate a station from the broadcasting field in which the Supreme Court reversed entry of summary judgment because a genuine issue as to a material fact had been brought out).